UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

CHRISTINA DURFEE,                    )
                                     )
        Plaintiff,                   )
                                     )
    vs.                              )    Case No. 4:13CV385 CDP
                                     )
CAROLYN W. COLVIN[1]                 )
Acting Commissioner of Social Security, )
                                     )
        Defendant.                   )

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 405(g) for judicial review of the

Commissioner of Social Security's final decision denying Christina Durfee's[2]

application for benefits under Titles II and XVI of the Social Security Act, 42

U.S.C. §§ 401 *et seq.* and 42 U.S.C. §§ 1381 *et seq.* Because Durfee amended her

date of disability to a time after the expiration of her insurance benefits, she waived

her claims under Title II. Substantial evidence exists to support the Administrative

Law Judge's Residual Functional Capacity determination, and so I will affirm the

Commissioner's decision to deny Durfee benefits under Title XVI.

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013.
As such, she should be substituted for Michael J. Astrue as the defendant in this suit.
Fed. R. Civ. P. 25(d).
[2] Christina Durfee also uses the surname Woods.

# 1. **Background**

## 1.1 Procedural History

On June 3, 2010, Durfee filed claims for a Period of Disability and Disability Insurance Benefits under Title II and for Supplemental Security Income under Title XVI. Both claims alleged an initial onset date of February 1, 1996. Later, these claims were amended to allege disability beginning June 3, 2010. After her initial determination was unfavorable, Durfee testified before an Administrative Law Judge (ALJ) at a hearing held October 31, 2011. The ALJ found Durfee not disabled and the Appeals Council declined to review the matter. Thus, the ALJ's ruling stands as the final decision of the Commissioner.

## 1.2 Evidence before the ALJ

### 1.2.1 *Application for Benefits*

Durfee is 5' 4" tall and weighs 230 pounds. She has a high school education and an Associate's Degree in applied science. She attended special education classes from third to fifth grade. Durfee was thirty-five at the time she applied for benefits. Her work history included five forty-hour weeks as an assembler in the summer of 2004, two months as a telemarketer in 1999 at twenty-five hours per week, and five months as a cashier/fitting room attendant between 1997 and 1998 at twenty-five hours per week. She stopped working each of those jobs because of

her "medical condition." She listed the following conditions that limit her ability to work: depression, anxiety, panic attacks, insomnia, and mood disorder.

On her application, Durfee wrote that she forgets to take her medicine and change her clothes for a couple days at a time, and only acts when reminded by family members. She cannot shop alone, because she gets "nervous." She enjoys playing ball with her kids "until all the noise and things get to me." Durfee has missed her kids' activities because "I get so scared and nervous I cannot go out of the house . . . ." She used to coach her kids' teams but now has to sit back and watch. (Tr. 194).

### 1.2.2    *Medical Records*[3]

On May 19, 2010, Durfee received mental health services from psychiatrist Dr. Gautam Rohatgi. Dr. Rohatgi's notes include Durfee's reports that she goes for days without performing basic hygiene and only acts when her family brings it to her attention. Durfee described symptoms of anxiety when going places, and panic attacks accompanied by headaches and shortness of breath that occur two to three times per week; she deals with the panic attacks by isolating herself for twenty to thirty minutes. She stated that she gets angry at family members but not at strangers. Dr. Rohatgi's mental status examination described Durfee: grooming and hygiene appropriate; exhibited no abnormality of gait; facial expressions

---

[3] Although the court has examined the entirety of the transcript, the summary of medical records includes only those portions pertinent to Durfee's claims and the ALJ's decision.

appropriate; thought process linear; thought content devoid of delusions, phobias, suicidal or homicidal ideations, or obsessions; affect depressed; mood depressed; perceptions without hallucinations; insight fair; judgment fair-to-poor; patient used humor at time to mask issues, was tearful when discussing some issues. Diagnoses included: major depressive disorder, recurrent; anxiety disorder, not otherwise specified; rule out generalized anxiety disorder with panic attacks; cluster B and C traits; gait difficulty; "nephrolithiasis?";[4] GAF: 55 to 60.[5] He prescribed citalopram and trazodone.[6] (Tr. 242–43).

Dr. Rohatgi saw Durfee again on June 2, 2010. He noted that she had appropriate affect and good mood, with fair judgment. Diagnoses, including GAF, were the same as on May 19, 2010. He again prescribed trazodone and instructed if no side effects to start Zoloft.[7] (Tr. 239).

A Psychiatric Review Technique Form was completed by psychologist James Spence on July 20, 2010. Dr. Spence determined that Durfee had major

---

[4] Nephrolithiasis is more commonly known as kidney stones. Medline Plus, National Institutes of Health, http://www.nlm.nih.gov/medlineplus/kidneystones.html (last visited Feb. 28, 2014).
[5] A Global Assessment of Functioning (GAF) is the clinician's judgment of the individual's overall level of functioning, not including impairments due to physical or environmental limitations. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 30–32 (4th ed. 2000) (*DSM-IV*). A GAF score of 51 to 60 indicates "moderate symptoms ... or moderate difficulty in social, occupational, or school functioning." *DSM-IV* at 34.
[6] Citalopram and trazodone are antidepressants. Medline Plus, National Institutes of Health, http://www.nlm.nih.gov/medlineplus/druginformation.html (Medline) (last visited Feb. 28, 2014). Trazodone was prescribed for insomnia. (Tr. 243).
[7] Zoloft (sertraline) is an antidepressant used to treat depression and social anxiety disorder, among others. Medline (last visited Feb. 28, 2014).

depressive disorder – recurrent, and anxiety disorder – not otherwise specified.  He

left blank the area in which to write the pertinent symptoms, signs, and laboratory

findings substantiating the presence of the impairments.  (Tr. 250–51).  However,

Dr. Spence did refer to her mental health exams in May and June of 2010, and

found that Durfee was partly credible in her complaints based on her mental

examination records.  He noted that she is on medications, reports some

improvement in symptoms, and is expected to continue to improve.  Dr. Spence

marked that she had mild restriction of daily living activities, had moderate

difficulties in maintaining social functioning, concentration, persistence, or pace,

and had no episodes of decompensation of extended duration.  Dr. Spence found

that Durfee was "able to perform at least simple, repetitive tasks on a sustained

basis and will be best away from others."  (Tr. 257).

Dr. Spence also completed a Mental Residual Functional Capacity

Assessment on July 20, 2010.  There were no areas in which Durfee was markedly

limited.  She was moderately limited in the ability to: understand, remember, and

carry out detailed instructions; maintain attention and concentration for extended

periods; work in coordination with or proximity to others without being distracted

by them; accept instructions and respond appropriately to criticism from

supervisors; get along with coworkers or peers without distracting them or

exhibiting behavioral extremes; and set realistic goals or make plans independently of others. For all other categories, Durfee was not significantly limited. (Tr. 260).

Durfee was admitted to Mercy Hospital on August 20, 2010, and she was discharged on August 24. There, she was treated by Dr. Asif Habib, a psychiatrist. She primarily complained of severe depression, secondary to an investigation begun by the Department of Family Services. She described her symptoms to include lost interest in normal activities, poor energy and sleep, feeling hopeless, and poor appetite, but she denied any manic symptoms like increased energy, hypertalkativeness, or grandiosity. Durfee's diagnoses included: major depression, recurrent, without psychotic feature; obesity; and a GAF of 25 for the current year, 80 for past year.[8] (Tr. 288–89).

On September 2, 2010, Durfee was seen by Dr. Habib at Mid-America Psychiatric Consultants with complaints of "mood swings." She was prescribed Cymbalta, Lamictal, Klonopin, and Ambien.[9] Diagnoses included Bipolar disorder, most recently depressed type, and obesity. Durfee's GAF was 51/55.

---

[8] A GAF score of 21 to 30 indicates the individual's "[b[ehavior is considerably influenced by delusions or hallucinations" or the individual has a "serious impairment in communication or judgment . . . or [an] inability to function in almost all areas." *DSM-IV* at 32. A GAF score of 71 to 80 indicates transient symptoms and "no more than slight impairment in social, occupational, or school functioning." *Id.* at 34.

[9] Cymbalta (duloxetine) is a drug used to treat depression, anxiety, and neuropathic pain. Klonopin (clonazepam) is used to relieve panic attacks. Lamictal (lamotrigine) is used to increase the time between episodes of depression, mania (frenzied or abnormally excited mood), and other abnormal moods in patients with bipolar disorder. Ambien (zolpidem) is used to treat insomnia. Medline (last visited Feb. 27, 2014).

She was scheduled for a follow up appointment in one month for medication management. (Tr. 331). On September 30, Durfee reported that she was "doing better." Dr. Habib's notes reflect that her depression was stable, her anxiety had improved, and she had no complaints of side effects from her medications. He diagnosed her with bipolar disorder, most recently depressed type, increased her dosage of Lamictal, and kept her on her other medications. Dr. Habib recommended a follow up in three months for medication management. (Tr. 332).

Between September 2010 and January of 2011, Durfee sought medical assistance numerous times From Dr. Anette Malcolm, her primary doctor, and St. Alexius Hospital for abdominal pain, problems associated with menstruation, and ultimately had her gallbladder removed. (Tr. 54; 263–70, 313–15).

On December 30, 2010, Durfee returned to Dr. Habib, who noted that she described her depression as stable and denied manic symptoms and psychosis. He diagnosed her as having bipolar disorder, most recently depressed type. Dr. Habib increased Durfee's dosage of Lamictal and continued her on her other medications. He scheduled a follow up in three months for medication management. (Tr. 333).

On March 21, 2011, Durfee saw Dr. Malcolm for a non-productive cough, shortness of breath, chest/back pain, and irregular menstrual cycle. Dr. Malcolm reported that Durfee had been coaching high school softball but unable to participate because of shortness of breath and weakness. Durfee was diagnosed

with chest pains, pleurisy and shortness of breath, fatigue, menorrhagia, hypertension, and urinary incontinence. (Tr. 312). Durfee was admitted to St. Alexius on March 22 for nonproductive cough, chest pain, and shortness of breath. She again stated that she was coaching a high school softball team but had to stop "a few days ago" due to weakness and fatigue; she stated these problems affected her daily life. Her assessments included history of hypertension, controlled on medication and bipolar disorder, among others. She was given a good prognosis. (Tr. 304–07).

Durfee was seen by Dr. Habib on May 5, 2011. She reported that she was "doing well" and denied manic symptoms and psychosis. Dr. Habib kept her on the same psychiatric medications as prescribed in December 2010 and diagnosed her with bipolar disorder, most recently depressed type. (Tr. 334).

Dr. Malcolm treated Durfee on June 30, 2011, for swelling of the lower extremities. She was diagnosed with depression, menorrhagia, and migraines, among other ailments. (Tr. 311).

Dr. Malcolm treated Durfee for back pain and urinary frequency on September 21, 2011. She diagnosed Durfee with recurrent urinary tract infection, lower back pain, obesity, major depression, and bipolar disorder.

Dr. Malcolm conducted a Physical Residual Functional Capacity Questionnaire on September 21, 2011. Durfee's diagnoses were menorrhagic

recurrent urinary tract infection and back pain, for which she was given a fair prognosis. Symptoms included vaginal bleeding and depression. When describing Durfee's pain, Dr. Malcolm wrote that "Patient reports lower back worse on sitting or standing. Persistent lower abdominal pain." She left blank the space for clinical findings and objective signs. As to treatment and response, Dr. Malcolm wrote, "Patient states she has issues with taking medication." She quoted Durfee: "I don't think I should be taking pills and I gag." (Tr. 280). Dr. Malcolm assessed Durfee's ability to sit, stand and/or walk at less than two hours in an eight-hour workday; she would need periods of walking approximately every fifteen minutes for five minutes at a time; and needed a job that allowed shifting between positions at will. Durfee could occasionally lift less than ten pounds. Durfee would need more than ten breaks of around twenty minutes each per eight-hour work day. Dr. Malcolm indicated Durfee would miss more than four days of work per month and was incapable of even low stress jobs, explaining, "Patient states she hides in bedroom during times of stress and if not, she'll become very mean." (Tr. 281). Dr. Malcolm stated that Durfee's diagnoses of social and generalized anxiety disorder, major depression and bipolar disorder have negatively affected her ability to work on a sustained basis. (Tr. 284).

On September 22, 2011, Dr. Habib saw Durfee, who reported that she was doing "alright" with stable depression and no manic symptoms or psychosis to

report. He diagnosed Durfee with bipolar disorder, most recently depressed type and continued her on the same dosage of her medications. (Tr. 335).

### 1.2.3 *Claimant Testimony*

At the hearing before the ALJ, Durfee testified that she had five children between ages four and fourteen. She achieved an Associate's Degree in applied science through at-home work done between 2003 and 2005.

Durfee discussed her daily activities. She testified that she used to coach her kids' softball and baseball teams but stopped "because I can't keep things together and I have to go and be with all the people." She clarified that she misses appointments because her anxiety makes her unable to leave her home. (Tr. 67). When she watches her kids' games, sometimes she has to leave the stands and watch from her car. (Tr. 39–40). She conducts her parent-teacher conferences by telephone. (Tr. 46). Her two eldest children help with the laundry, cooking, and caring for the youngest child. (Tr. 48).

Durfee testified that she goes from one extreme to another. On the "downside," she will stay in her room for days at a time, emerging to ensure the kids go to school and then retreating to "do nothing." She "can't find a happy medium." (Tr. 41). Durfee testified that her medication helps her "stay regular for a while" but that she still suffers anxiety and panic attacks. (Tr. 41). Durfee stated that it was during an "aggressive part" that she "smacked" her eldest child as part

of an argument.  She said that if it were not for that, she would have not gotten any help because "it's embarrassing."  (Tr. 54–55).

Family services became involved with Durfee in 2010 after that incident. She was referred to Dr. Gautam Rohatgi, a psychiatrist with COMTREA, but eventually switched to St. John's Mercy, where she began counseling with a new psychiatrist, Dr. Asif Habib.  She testified that she sees Dr. Habib about once a month and has been on the same prescription for two or three refills.  She takes Cymbalta, Klonopin, Lamictal, Topamax, and Ambien.[10]  (Tr. 56 –61).

Durfee testified that part of her treatment involves retreating to her bedroom as a coping mechanism, which she will do for at least an hour about four days a week.  When she does this, the older children care for the younger ones, or sometimes her aunt will assist.  (Tr. 66–67).

Durfee discussed her past work experience.  She said that in 2004, she worked a short-term job that required her to bring things home to assemble. Durfee had to stop, because the work could only be accomplished while the kids were asleep.  (Tr. 43–44).

---

[10] Topamax (topiramate) is used to prevent migraine headaches.  Medline (last visited Feb. 27, 2014).

### 1.2.4   *Vocational Expert Testimony*

The Vocational Expert (VE) testified that Durfee's 2004 job did not qualify as past relevant work.  (Tr. 45).  The ALJ then posed a hypothetical individual with the same age, education, and experience as Durfee, which included no past relevant work experience.  This individual would be limited to working in a low-stress environment, defined as occasional decision making and occasional changes in the work setting, no interaction with the general public, occasional interaction with coworkers, and isolated work with supervisory contact no more than twice a day.  The VE said that such an individual's work would be considered light and unskilled.  Available jobs include "sorter," of which 1300 exist in the local economy and 62,400 exist in the national economy, and "assembler," of which 2100 and 100,800 exist in the respective local and national economies.  The VE testified that if the additional restriction of occasional judgment was placed on the hypothetical individual's work, there would be roughly ten percent fewer jobs available in the local and national economies.

Assuming that the hypothetical individual was limited to work with no stress,[11] but otherwise retained the same age, education, and experience, the VE

---

[11] The ALJ defined no stress as having: no changes in the work setting, no judgment required, no interaction with the public, no interaction with coworkers, two interactions per day with a supervisor, and allowing up to four absences a month.

determined that there would be no available work.  Nor would there be any at-home work available for an unskilled person.

On cross-examination, the VE testified that there would be no jobs available for an individual who had to take unpredictable and unscheduled periods away from the job several times per day for up to an hour at a time.  (Tr. 70–79).

### 1.3    The ALJ's Decision

The ALJ determined that because Durfee amended her alleged onset date to a time after her insurance coverage expired, she had voluntarily dismissed her claims for disability insurance benefits under Title II.  She does not challenge that decision.  As to her claims for Title XVI supplemental security income, the ALJ made the following findings of fact and conclusions of law:

> 1.    The claimant has not engaged in substantial gainful activity since June 3, 2010, the application date.
>
> 2.    The claimant has the following severe impairments: depression/bipolar disorder and anxiety.
>
> 3.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.
>
> 4.    [T]he claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant is limited to routine, repetitive tasks; she is limited to work in a low-stress environment, with low stress defined as occasional decision-making, occasional changes in the work setting and occasional judgment required; she should have no interaction with the public but is able to have occasional

interaction with co-workers; and she is limited to basically isolated work with supervisory contact no more than twice a day.

5.     The claimant has no past relevant work.

6.     The claimant was . . . 35 years old, which is defined as a younger individual age 18–49, on the date the application was filed.

7.     The claimant has at least a high school education and is able to communicate in English.

8.     Transferability of job skills is not an issue because the claimant does not have past relevant work.

9.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

10.    The claimant has not been under a disability, as defined in the Social Security Act, since June 3, 2010, the date the application was filed.

## 2.     <u>Discussion</u>

### 2.1     <u>Legal Standards</u>

To be eligible for Social Security Disability Insurance Benefits and Supplemental Security Income under the Social Security Act, plaintiff must prove that she is disabled.  *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *Baker v. Secretary of Health & Human Servs.*, 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."

42 U.S.C. §§ 423(d)(1)(A), 1382c (a)(3)(A).  An individual will be declared disabled "only if her physical or mental impairment or impairments are of such severity that she is not only unable to do [her] previous work but cannot, considering her age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A), 1382c (a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process.  *See* 20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987).  The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity.  If the claimant is working, disability benefits are denied.  Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits her ability to do basic work activities.  If the claimant's impairment(s) is not severe, then she is not disabled.  The Commissioner then determines whether claimant's impairment(s) meets or is equal to one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1.  If the claimant's impairment(s) is equivalent to one of the listed impairments, she is conclusively disabled.  At the fourth step, the Commissioner reviews whether the claimant has the Residual Functional Capacity (RFC) to perform her past relevant work.  If the claimant can perform her past relevant work, she is not disabled.  If

the claimant cannot perform her past relevant work, the burden of proof shifts and the Commissioner must evaluate whether the claimant can perform other work in the national economy. If not, the Commissioner declares the claimant disabled. *See Cox v. Apfel*, 160 F.3d 1203, 1206 (8th Cir. 1998); 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002). Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion. *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001). This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings." *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted). "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis." *Id.* (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the court must review the entire administrative record and consider:

1. The credibility findings made by the ALJ.
2. The plaintiff's vocational factors.

3. The medical evidence from treating and consulting physicians.
4. The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.
5. Any corroboration by third parties of the plaintiff's impairments.
6. The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

*Stewart v. Sec'y of Health & Human Servs.*, 957 F.2d 581, 585–86 (8th Cir. 1992)

(quoting *Cruse v. Bowen*, 867 F.2d 1183, 1184–85 (8th Cir. 1989)).

The court must also consider any evidence which fairly detracts from the Commissioner's decision. *Coleman*, 498 F.3d at 770; *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999). However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the record as a whole. *Pearsall*, 274 F.3d at 1217 (citing *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000)). "[I]f there is substantial evidence on the record as a whole, we must affirm the administrative decision, even if the record could also have supported an opposite decision." *Weikert v. Sullivan*, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted); *see also Jones ex rel. Morris v. Barnhart*, 315 F.3d 974, 977 (8th Cir. 2003).

## 2.2    Analysis

Durfee claims that the ALJ's RFC determination was not supported by substantial evidence because the ALJ improperly discredited the opinion of her

primary care physician, Dr. Malcolm, improperly relied upon the opinion of Dr.

Spence, and was not otherwise supported by medical evidence. Durfee also argues

that because the hypothetical posed to the vocational expert used the defective

RFC, the answer cannot constitute substantial evidence that Durfee can perform

other work in the national economy. I will address each argument in turn, before

looking to Durfee's Title II claims.

### 2.2.1    *RFC Determination*

At Step Four of the sequential analysis, the ALJ is required to determine a

claimant's RFC. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004).

RFC is what a claimant can do despite the limitations caused by her impairments.

*McGeorge v. Barnhart*, 321 F.3d 766, 768 (8th Cir. 2003); *Dunahoo v. Apfel*, 241

F.3d 1033, 1039 (8th Cir. 2001). Although the claimant has the burden to establish

her RFC, the ALJ bears the primary responsibility for assessing the RFC based on

all relevant, credible evidence in the record, including medical records, the

observations of treating physicians and others, and the claimant's own description

of her symptoms and limitations. *McGeorge*, 321 F.3d at 768; *see also Goff v.

Barnhart*, 421 F.3d 785, 793 (8th Cir. 2005); *Eichelberger*, 390 F.3d at 591;

20 C.F.R. §§ 404.1545(a), 404.1546(c).

The ALJ found that Dr. Malcolm's opinions as to Durfee's physical

limitations were both internally and externally inconsistent. Dr. Malcolm stated

that Durfee could only sit and stand for fifteen minutes at a time, and was limited to two hours out of an eight-hour workday spent sitting, standing, and walking. Although Durfee did seek treatment for abdominal pain, weakness, and fatigue, there is nothing in Dr. Malcolm's notes or in the medical record as a whole indicating that Durfee's symptoms were so limiting as Dr. Malcolm suggests. Dr. Malcolm's opinion was based on Durfee's self-report, however, neither Durfee's testimony or her application for benefits made any mention of physical impairments that would keep her from working.

An ALJ may give less weight to a physician whose opinion is based on the subjective complaints of the patient, rather than upon objective medical evidence. *Kirby v. Astrue*, 500 F.3d 705, 709 (8th Cir. 2007); *see also Charles v. Barnhart*, 375 F.3d 777, 784 (8th Cir. 2004) (finding doctor's assessment unsupported by substantial evidence where doctor's records failed to note physical restrictions). Dr. Malcolm's opinion as to Durfee's physical limitations was not supported by her own notes or even by Durfee. Substantial evidence supports the ALJ's decision to accord little to no weight to that opinion.

The ALJ rejected Dr. Malcolm's opinion that Durfee was incapable of working even in low-stress environments, because the opinion appeared to be based on self-reports, because Dr. Malcolm was not a treating doctor for Durfee's

psychological conditions, and because the opinion was not supported by either her own notes nor by the objective medical evidence of record.

An ALJ may "discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." *Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000). An ALJ may discount a doctor's opinion where it transcends her area of expertise. *See Wildman v. Astrue*, 596 F.3d 959, 967 (8th Cir. 2010); *see also* 20 C.F.R. §§ 404.1527(c)(5), 416.927(c)(5) ("We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist."). Although Dr. Malcolm's notes include diagnoses for bipolar disorder, depression, and other mental conditions, she never treated Durfee for those conditions. Dr. Malcolm is not a psychologist and, when explaining her RFC conclusion, she simply recounted Durfee's own statements. Because Dr. Malcolm based her opinion upon Durfee's subjective complaints, rather than the objective medical evidence, the ALJ properly discounted her opinion. *See Kirby*, 500 F.3d at 709.

Contrary to Durfee's arguments, the ALJ properly relied upon Dr. Spence's opinion when determining that Durfee's RFC limited her to working in a low-stress environment, including no interaction with the public, occasional

interactions with co-workers, and "basically isolated work." A psychological

consultant's opinion is to be considered as opinion evidence. *See* 20 C.F.R.

§416.927(e)(2)(i). When a consulting physician disputes a treating physician's

opinion, the ALJ must resolve the conflict between those opinions. *Cantrell v.

Apfel*, 231 F.3d 1104, 1107 (8th Cir. 2000). Although "[a]s a general matter, the

report of a consulting physician who examined a claimant once does not constitute

'substantial evidence' upon the record as a whole," especially when it conflicts

with that of a treating physician, the Eighth Circuit has recognized that a

consulting physician may be accorded greater weight in two circumstances: (1)

where it is supported by better or more thorough medical evidence, or (2) where

the treating physician's opinion has been properly discredited. *Wagner v. Astrue*,

499 F.3d 842, 849 (8th Cir. 2007) (internal quotations omitted) (citing *Cantrell*,

231 at 1107).

As discussed above, Dr. Malcolm's opinions were entitled to little weight,

because they relied entirely on Durfee's self-reports and not on any objective

evidence. In contrast, Dr. Spence's opinion was supported by objective medical

evidence of record. Dr. Spence noted that Durfee had no mental health treatment

until May of 2010, when family services became involved, and that June 2010

treatment notes indicated that she was improving through the use of medication.

The ALJ's decision to rely on Dr. Spence's opinion is supported by substantial evidence.

In addition to Dr. Spence's opinion, there exists substantial evidence in the record as a whole, including the available medical evidence, to support the ALJ's RFC assessment. Durfee's GAF scores were 55–60, 55–60, 25, 80 and 51/55. The lowest score, 25, came at a time when Durfee was hospitalized while being investigated by family services for the potential abuse of her daughter. Thereafter, Durfee's score rose to a level reflecting moderate difficulty in occupational functioning. There are no records of subsequent hospitalizations for psychiatric reasons. After the incident with her daughter, Durfee maintained periodic psychological treatments for medication management. The notes from Dr. Habib indicate that she reported doing well, her depression stabilized, and that her anxiety improved. Although Durfee reported to Dr. Malcolm that she had difficulty taking her medications, Dr. Habib's notes reflect that she was compliant with her medical treatment and that she was suffering no side effects from her medication.

The non-medical evidence also supports the ALJ's determination. For example, Durfee testified that she is able to go shopping when accompanied by others and that she can tolerate at least some interaction with the public until it gets to be too much to handle. Durfee also told Dr. Malcolm that she was coaching softball but had to stop because of fatigue; she did not mention anxiety as a

potential cause. She told Dr. Rohatgi that her anger does not come out towards strangers, but does manifest towards family members. These facts support the ALJ's limitation of Durfee to a low-stress work place with limited interaction with coworkers and limited supervisory contact.

When reviewing a denial of Social Security benefits, a court cannot reverse an ALJ's decision simply because the court may have reached a different outcome, or because substantial evidence might support a different outcome. *Jones*, 315 F.3d at 977. While there is evidence in the record that Durfee's ability to work is more limited than described in the ALJ's RFC determination, there is substantial evidence on the record as a whole that supports the ALJ's RFC determination, and I am bound by it.

### 2.2.2   *Ability to Perform Other Work*

Durfee argues that the VE's testimony that she could perform work in the national economy was faulty because the VE was not presented with the limitations listed in Dr. Malcolm's report. Testimony from a vocational expert based on a properly-phrased hypothetical constitutes substantial evidence. *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996). The hypothetical need only include those impairments that the ALJ determines are substantially supported by the record as a whole. *Lacroix v. Barnhart*, 465 F.3d 881, 889 (8th Cir. 2006). As noted above, the ALJ's RFC determination is supported by substantial evidence.

The hypothetical question rephrased the RFC for the VE and was therefore proper. The VE's answer constituted substantial evidence supporting the Commissioner's denial of benefits.

### 2.2.3    *Title II Claims*

To meet the requirements for insured status, an individual is required to have twenty quarters of coverage in a forty-quarter period ending with the first quarter of disability.  *See* 42 U.S.C. §§ 416(i)(3)(B) & 423(c)(1)(B); 20 C.F.R. § 404.130. To be entitled to benefits under Title II, Durfee must establish that she was disabled prior to the date her insured status expired.  The ALJ properly determined that Durfee's earnings records show that she remained insured only through June 30, 1998.  Because Durfee's amended disability onset date of June 3, 2010 is after her last coverage date, she is not entitled to disability insurance benefits.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner denying benefits is **affirmed**.

A separate judgment in accordance with this Memorandum and Order is entered this date.

CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 14th day of March, 2014.